OPINION
{¶ 1} Appellant-defendant, David J. Brown, Jr., appeals the judgment entry of conviction and sentencing of the Common Pleas Court of Logan County, Ohio, finding him guilty of aggravated murder, aggravated robbery, and gross abuse of a corpse and sentencing him accordingly.
{¶ 2} On March 29, 2001, an employee of Wammes Storage in Bellefontaine, Ohio, found something suspicious looking inside an unlocked storage unit. The police were dispatched to the unit, where they found the body of eighteen-year-old James Tanner wrapped in plastic and tied with what appeared to be a phone cord. In addition to the wrapping of the body, Tanner's pants pockets were turned inside out. The discovery of Tanner's body prompted an investigation by the local authorities. A subsequent autopsy of the body revealed that Tanner died as a result of a stab wound to the heart.
{¶ 3} During the course of the investigation into the murder of Tanner, the authorities discovered that Tanner sold crack cocaine and was last seen at a crack house operated by the defendant, David Brown, Jr., on Elm Street in Bellefontaine. Tibor Jonas, a crack addict, confessed to the police that he aided the defendant in disposing of Tanner's body after the defendant killed Tanner in the upstairs bedroom of his home. Jonas also told the police that he and the defendant took $25.00 from Tanner's pocket and some crack cocaine from Tanner's sock. The police conducted two searches of the defendant's home. At the home, the authorities found what appeared to be blood on a blanket in an upstairs bedroom, on the carpeting in the home, and on a curtain on the stairway landing. An analysis of the blood revealed that the blood on these three items belonged to Tanner.
{¶ 4} The police arrested the defendant on April 6, 2001, for the murder of James Tanner. The case proceeded to trial on January 7, 2002. On January 10, 2002, the jury found the defendant guilty of aggravated murder, aggravated robbery, and gross abuse of a corpse. Thereafter, the trial court sentenced the defendant to life in prison for the aggravated murder of James Tanner, six years in prison for the aggravated robbery, and ten months for the gross abuse of a corpse. This appeal followed, and the defendant now asserts five assignments of error.
 First Assignment of Error {¶ 5} "APPELLANT DENIED RIGHT TO CONFRONT HIS ACCUSERS WHERE STATE INTRODUCED INADMISSIBLE HEARSAY TESTIMONY OF POLICE OFFICER IN VIOLATION OF THE SIXTH AMENDMENT OF THE FEDERAL CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION. (Vol. III, TR. 475-537)."
{¶ 6} The defendant maintains that the bulk of the testimony of Detective Brian Kennedy, the lead detective in this case, constituted inadmissible hearsay because the detective did not have first-hand knowledge of many of the matters about which he testified. The Rules of Evidence prohibit the use of hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C); Evid.R. 802. Hearsay is only admissible if it meets one of the exceptions enumerated in the Rules of Evidence. Evid.R. 802. However, when no objection is made to inadmissible evidence at trial, the party waives any such objection, and an appellate court may not reverse the conviction and grant a new trial absent plain error. State v.Johnson (1994), 71 Ohio St.3d 332, 339 (citing State v. Johnson (1989),46 Ohio St.3d 96, 103); State v. Tomlinson (1986), 33 Ohio App.3d 278,281.
{¶ 7} Detective Kennedy testified about how he conducted the investigation of Tanner's death and what the investigation "revealed." Specifically, Detective Kennedy testified that "[t]he investigation revealed that an individual by the name of David Brown had done that [killed Tanner]." In addition, the Detective stated that $300.00 worth of crack and cash were removed from Tanner's body, although he did not have first-hand knowledge that Tanner was in possession of these items. Trial counsel for the defendant objected to both of these statements based upon the hearsay rule. The trial court sustained both objections and instructed the jury to disregard the statements. Therefore, we find no error occurred as to these statements, which were cured by the lower court during the trial. However, Detective Kennedy also testified about Tanner's movements on the days leading to his death, as well as the specifics about what happened in the defendant's home on the day Tanner was killed. During his testimony, the detective used a charted timeline to demonstrate the sequence of events leading to Tanner's death, but the time line was not admitted into evidence. Trial counsel did not object to this testimony and, thus, this matter is considered waived absent plain error.
{¶ 8} Plain error does not exist unless it can be said that, but for the alleged mistake, the outcome of the trial clearly would have been otherwise. State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus. Only extraordinary circumstances and the prevention of a miscarriage of justice warrant a finding of plain error. Id. at paragraph three of the syllabus. The detective's testimony as to the actions of Tanner prior to his death did not contribute to the verdict, as this information concerned collateral matters. As for his testimony regarding the activity in the defendant's home on the day Tanner was killed, the detective's testimony was cumulative. Other witnesses at the trial who were actually there on that day, including Tibor Jonas, provided testimony similar to Detective Kennedy's as to who was in the house, who left with whom, and the presence of James Tanner in the home.
{¶ 9} While the defendant maintains that Detective Kennedy's testimony served to bolster the credibility of other witnesses for the State by providing police endorsement of their version of the events, these other witnesses corroborated one another. Thus, this Court does not find that, but for this testimony, the outcome of the trial clearly would have been otherwise beyond a reasonable doubt. Moreover, we find that these circumstances are not so extraordinary so as to warrant a finding of plain error. Therefore, the first assignment of error is overruled.
 Second and Third Assignments of Error {¶ 10} "APPELLANT'S CONVICTION FOR AGGRAVATED MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION. (In passim)"
 {¶ 11} "APPELLANT'S CONVICTION FOR AGGRAVATED ROBBERY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION. (In passim)"
{¶ 12} In reviewing whether the verdict was against the manifest weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Adkins (Sept. 24, 1999), Hancock App. No. 5-97-31, 1999 WL 797144 (citing State v. Martin (1983),20 Ohio App.3d 172, 175; State v. Thompkins (1997), 78 Ohio St.3d 380,387). In addition, "`the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Campbell (2000), 90 Ohio St.3d 320, 329
(quoting Jackson v. Virginia (1979), 443 U.S. 307, 319). In making this determination, there are eight factors to consider, which include "whether the evidence was uncontradicted, whether a witness was impeached, what was not proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness' testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary." State v. Apanovitch (1987), 33 Ohio St.3d 19, 23-24
(citing State v. Mattison (1985), 23 Ohio App.3d 10, syllabus). However, "[t]he verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." State v. Jenks (1991), 61 Ohio St.3d 259, 273.
{¶ 13} The defendant was charged with violating Revised Code section 2903.01(B), which states in relevant part that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing * * * aggravated robbery[.]" The defendant was also charged with aggravated robbery: "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code * * * shall do any of the following: * * * (3) Inflict, or attempt to inflict, serious physical harm on another." R.C. 2911.01(A)(3).
{¶ 14} The defendant does not dispute whether these crimes were committed, but rather, he maintains that his convictions were against the manifest weight of the evidence as the State did not sufficiently demonstrate that he was the person who committed the crimes. In support of this argument, the defendant contends that the State's theory was that he killed Tanner to feed his addiction to crack cocaine but that the State was unable to show that the defendant did not have drugs, money to buy drugs, or another means of obtaining drugs. In addition, the defendant asserts that the State's case relied heavily upon the testimony of Tibor Jonas, a convicted felon with an addiction to crack, and the presence of the defendant's footprint on the plastic wrapped around Tanner, which proved only that the defendant touched the wrapping at some point. The defendant also maintains that much of the forensic evidence presented at trial was actually exculpatory.
{¶ 15} The State presented several witnesses during the defendant's trial. Tibor Jonas testified about the events surrounding Tanner's death as follows: Jonas testified that he was with the defendant from March 27, 2001, until March 29, 2001. During much of this time, the two men were getting high on crack and drinking or looking for more crack to use. Jonas further testified that several people were in and out of the defendant's home on Elm Street during this time, either buying, selling, and/or using drugs, including James Tanner who was selling drugs. He also stated that Tiffany Tackett was there, checking those who entered for any wiretaps. At some point on March 28, 2001, the defendant tried to get Tanner to give him some crack in exchange for a stolen television because he ran out of crack, but Tanner refused, stating that he only took cash. Jonas then drove the defendant to another home where the defendant told him that he was giving the television to another person to whom he owed money. Later that night or in the early morning hours of the 29th, Jonas gave Deandre Tucker, who was also at the defendant's home, a ride and then returned to the Elm Street residence where only the defendant, Tiffany Tackett, and Tanner remained. Jonas then left with Tackett and the defendant, leaving only Tanner at the Elm Street house. The three drove to the home of Fran Lyburtus on Chillicothe Street. However, Lyburtus was not there.
{¶ 16} Shortly after entering Lyburtus' home, the two men departed, leaving Tackett alone at the Chillicothe Street home. Jonas and the defendant then drove back to the Elm Street residence. Jonas further testified that during the drive, the defendant stated that he wanted to "off" Tanner, but Jonas did not take him seriously. However, when they arrived at the defendant's home, the defendant told Jonas to help him take a red car out of his attached garage, which Jonas did. Jonas then backed his vehicle into the garage. Jonas testified that while the two were switching the location of the cars, the defendant stated that they were doing this so that they could dump Tanner in Jonas' car.[1] Upon entering the home, the defendant told Jonas to kill Tanner but Jonas said that he could not do it. Next, the defendant went upstairs to where Tanner was sleeping while Jonas remained downstairs. Jonas then heard Tanner state, "I've been stuck. I've been stuck." The defendant then came downstairs, now barefoot and wearing only red sweatpants, and told Jonas, "Fuck it, man, I just went ahead and did it." Jonas then heard movement upstairs and saw Tanner coming down the stairwell. Upon approaching the landing, Tanner reached for the curtain at the window and fell, taking down the curtain in the process.
{¶ 17} The defendant then told Jonas to get some Visqueen, a thick plastic, from the upstairs closet. Jonas went to the closet as instructed and found a relatively new roll of plastic in a cardboard box. Jonas testified that the defendant gave him black rubber gloves to wear and that the defendant put socks on his hands. The two men then went through Tanner's pockets and took $25.00 and his identification from his pockets, as well as $300-$400 worth of crack, which Tanner kept in his sock. They next placed Tanner's body on a sheet of Visqueen, which Jonas had cut with the defendant's knife. Jonas then ripped a cord from the fax machine in the room, and the two men used it to tie the Visqueen around the body. Next, the men dumped Tanner's body in the trunk of Jonas' car, used some crack, and attempted to burn Tanner's identification in a silver dish. When the identification did not burn, the defendant placed what remained in a brown paper bag and took it with them as they left to dispose of the body.
{¶ 18} Jonas testified that he and the defendant left with Tanner's body and drove to a storage facility with which the defendant was familiar. They went into an unlocked unit and left Tanner's body there. The two returned to the defendant's home, and the defendant gathered some of his belongings to take to the Chillicothe residence. Before driving to the Chillicothe home, the two stopped at a Shell gas station where the defendant disposed of the brown bag and bought some beer and cigarettes with the money taken from Tanner. Although the police searched the garbage receptacles a few days after Tanner's death, they were unable to locate this brown bag.
{¶ 19} At some point, Jonas asked the defendant about the knife, a green Army survival knife with a 6"-8" blade with a hole in it, to which the defendant responded that he should not worry about the knife. They returned to the Chillicothe home, where they drank the beer and used the crack with Tiffany Tackett. Jonas then returned to the Elm Street home for awhile but returned to the Chillicothe address to use more crack. He returned to Elm Street but came back once again. This time the defendant returned with Jonas to Elm Street, and Jonas remained there until late in the afternoon. While at the Elm Street home, various people came by looking for Tanner but were not allowed inside until the defendant arrived. Both Jonas and the defendant informed those in search of Tanner that they did not know where he was. Jonas then returned home to Sidney, Ohio, in the late afternoon.
{¶ 20} Tiffany Tackett also testified at the trial. She confirmed Jonas' testimony that the defendant ran out of crack on the night of March 28, 2001, and that a television was stolen so that it could be used to obtain more crack. She also testified that the defendant owed a lot of people money, that he would sometimes ask her to "sneak" some crack from Tanner, and that she checked people at the door of the Elm Street home for any wires. Tackett further testified that in the early morning hours of March 29, 2001, Jonas gave Deandre Tucker a ride, returned to the Elm Street home, and then she, the defendant, and Jonas went to the Chillocothe address, leaving Tanner alone at the home. Upon arriving at the Chillicothe residence, the defendant stated that they needed groceries, and then he and Jonas left, while she fell asleep. Tackett testified that when the two men returned a couple of hours later, the defendant entered the Chillicothe home waiving a baggie of crack, which she recognized as the same baggie she saw Tanner store his crack and then place in his sock. She confirmed Jonas' testimony that the three of them smoked some of this crack in the early morning hours of March 29, 2001. Further, Tackett testified that the defendant told Jonas to go back to the Elm Street home, which was always locked when the defendant was not there, and Jonas did as he was instructed but returned once or twice after that. Tackett also testified that she was quite familiar with an Army knife that the defendant owned, which had a blade approximately 8" long with a hole in it and that the defendant asked her that night where the knife was located.
{¶ 21} Deandre Tucker also testified at the trial. He testified that he and Tanner went to the defendant's Elm Street home sometime between the hours of 9:00 and 10:00 p.m. He gave the defendant some crack to sell and left. He came back to the home a few times then went to a bar until it closed. When he returned to the Elm Street residence, Tanner was there and still alive. The two men fell asleep, but he awoke and Jonas gave him a ride to a friend's home in the early morning hours of March 29, 2001. He confirmed that the defendant's home was a crack house and that Tanner sold crack out of this house.
{¶ 22} Tucker further testified that he saw the defendant, Jonas, and another person trying to sell a DVD player or something similar in exchange for crack. In addition, Tucker testified that when he returned to the Elm Street home later in the day on March 29, 2001, Jonas told him that no one else was there and would not permit him inside the home. He returned later only to be told the same thing by the defendant, except this time the defendant told Tucker that he had given Tucker's money and crack to Tanner. This time Tucker noticed that the house was unusually dark with only the kitchen light in use. Tucker testified that not being allowed in the home was unusual because people entered and exited the home with relative ease and freedom, with the exception of being checked for wires. Tucker, suspecting that something was amiss, returned later with two other people. This time they were allowed inside the home as was the normal occurrence. During cross-examination, Tucker testified that Tanner had $400.00 worth of crack cocaine but that he had sold some during the night. Tucker further testified on re-direct examination that the defendant has run out of crack cocaine on more than one occasion and was unable to obtain more.
{¶ 23} Fran Lyburtus also testified at the trial. She testified that she was surprised to see the defendant at her Chillicothe Street home on March 30, 2001, but that her home did not appear any different than how she left it. When shown photos of her home taken after the defendant's arrest, she noted that her closet doors were covering her windows and that a blanket was covering the doorway to the kitchen, both of which she had not done. Lyburtus testified that the red car outside of the defendant's home was hers, when shown photos taken of the defendant's home during one of the searches of the residence. In addition to her testimony, the State presented a tape recording of a conversation between the defendant and Lyburtus that they obtained on March 31, 2001, by placing a wire on her. Although the defendant repeatedly denied having killed Tanner after several accusations by Lyburtus and stated that he was with Tiffany Tackett at Lyburtus' home, he was aware that the police had searched his home, that Tanner was stabbed, and that Tanner had been killed in his home. In addition, the defendant threatened that any witness against him would be a "dead mother fucker" when Lyburtus informed him that Tackett would not support his version of the events on the day Tanner was killed.
{¶ 24} The defendant's brother, Andrew Conover, also testified on behalf of the State. He testified that when he went to the Chillicothe home looking for the defendant, the defendant opened the door holding an Army knife with a 8"-9" blade. Conover took the knife from the defendant and told him that he would dispose of it, but the defendant took it back from him. The defendant asked Conover to take him to Kelly Hackett's, an ex-girlfriend, so that he could wash his clothes, but upon arriving at Hackett's, the defendant would not exit the vehicle for fear that the police were looking for him, stating that he had a warrant for passing bad checks. Although the defendant had the Army knife when he left Lyburtus' home to go to Hackett's, Conover testified that the defendant told him that he had taken the knife and "gotten rid of it." However, the authorities extensively searched the route taken by Conover and the defendant to Hackett's home but did not recover any such knife. Many of the witnesses that testified stated that the defendant had a proclivity for knives, often throwing them at a wooden board located in his home. The police also found knives stuck in the floor of the Chillicothe residence. However, the State never proposed that any knife found by authorities was the murder weapon.
{¶ 25} In addition to the testimony of these lay witnesses, the State presented the testimony of various experts. Mark Squibb, a DNA analyst from the Miami Valley Regional Crime Lab, testified that the blood stains on the blanket, carpeting, and curtain recovered from the defendant's home belonged to James Tanner. However, clothes taken from the defendant and Tibor Jonas did not contain Tanner's blood nor did the defendant's red sweatpants. Hairs were also found on the plastic wrapped around Tanner's body. However, Squibb testified that the hairs were brown Caucasian and that he never received comparison samples. During cross-examination, Squibb testified that the hairs probably did not belong to the defendant based upon looking at him from the witness stand.
{¶ 26} Dr. Lee Lehman, who performed the autopsy on Tanner, testified that Tanner's pockets were turned inside out when he first received the body, testimony that was corroborated by photographic evidence taken during the autopsy. He further testified that Tanner died from a stab wound to the heart, approximately 1" in width and 4.5" in length, which could only be caused by a blade slightly less than 4.5" long or longer. Dr. Lehman also testified that a person who was stabbed in that manner could have walked a short distance but would have died almost immediately thereafter.
{¶ 27} Daniel Bibby, an expert in trace evidence, testified that the cord tied around Tanner's body belonged to the fax machine recovered from the defendant's home and that the cord had been torn from the fax machine. The State also presented the testimony of Ronald Huston, a latent print examiner with twenty-nine years of experience. Huston testified that he recovered a footprint from the piece of plastic used to wrap Tanner's body, which matched that of the defendant's left foot. However, Huston admitted during cross-examination that he could not determine how long the footprint had been on the plastic. In addition, other prints were found on the plastic, but they were not suitable for comparison. Huston did not recover any fingerprints from this plastic.
{¶ 28} Although many of the witnesses were inconsistent as to the exact times of various events that day and were slightly inconsistent as to specific details, their versions of what transpired were consistent. In addition, each witness placed James Tanner at the defendant's home from sometime in the evening of March 28, 2001, until the early morning hours of March 29, 2001, when he was left alone at the home. Also, no one testified to seeing him again until his body was discovered wrapped in plastic and tied with cord in an unlocked storage unit at Wammes Storage, a place where, according to business records admitted at trial, the defendant had rented a storage unit from 1993 until 1998. Moreover, Tackett's testimony as to what happened after she left the Elm Street home was consistent with Jonas' version of the events. Tackett's testimony established that the defendant left the Chillicothe residence with Jonas and was gone for over an hour. Her testimony also established that the defendant was in possession of Tanner's crack cocaine when he returned to the Chillicothe address, and it corroborated Jonas' testimony that the three smoked Tanner's crack cocaine upon their return.
{¶ 29} While no blood was found on any of the defendant's clothing, including the red sweatpants that Jonas stated the defendant was wearing when he came downstairs after stabbing Tanner, Tanner's blood was also not on the plastic wrapped around his body. However, Tanner's blood was found in places in the defendant's home that were consistent with Jonas' version of the events that night. In addition, the defendant's footprint was found on the piece of plastic used to wrap Tanner's body. Although the expert conceded that the footprint could have been placed there at another time, Jonas testified that the roll was fairly new and that the defendant was barefoot when the two men wrapped Tanner in the plastic.
{¶ 30} Although the defendant maintains that he had no motive to kill Tanner because he had ready access to crack, more than one witness testified that the defendant ran out of crack that night and was attempting to obtain some more in order to continue his high by attempting to exchange a stolen television. Moreover, Tackett testified that the defendant asked her to "sneak" some crack from Tanner on more than one occasion.
{¶ 31} In sum, the jury was presented with a witness who identified the defendant as the person who killed Tanner and stole money and crack cocaine from him. The State also presented evidence that Tanner was alive when he was left alone at the Elm Street home in the early morning hours of March 29, 2001, and that the defendant and Jonas were alone together around this same time frame. The evidence also established that Tanner was killed with a knife, a kind of weapon with which the defendant was extremely familiar. The defendant's footprint was also found on the plastic wrapped around the body, and he had previously rented a storage unit for five years at the same facility where Tanner's body was discovered. Furthermore, the defendant was seen with a baggie of crack cocaine identified as belonging to Tanner on the day of Tanner's death. Moreover, the forensic evidence corresponded with Jonas' version of the events.
{¶ 32} When viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. Thus, based upon our review of the record, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. Therefore, the second and third assignments of error are overruled.
 Fourth Assignment of Error {¶ 33} "STATE COMMITTED PROSECUTORIAL MISCONDUCT AT TRIAL DENYING APPELLANT A FAIR TRIAL GUARANTEED UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO FEDERAL CONSTITUTION AND SECTIONS 5 AND 10, ARTICLE I OF THE OHIO CONSTITUTION. (Vol. I Tr. 40; Vol. III, Tr. 488-97; Tr. III, Tr. 545)"
{¶ 34} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether the remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990),51 Ohio St.3d 160, 165 (citing State v. Smith (1984), 14 Ohio St.3d 13,14-15). However, "the touchstone of this analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Twyford,94 Ohio St.3d 340, 355, 2002-Ohio-894 (quoting Smith v. Phillips (1982),455 U.S. 209, 219).
{¶ 35} The defendant maintains that the prosecutor engaged in misconduct by eliciting inadmissible hearsay, asking a police officer whether the defendant ever asserted his innocence, and by informing the jury during voir dire that the grand jury had previously determined that he had probably committed the offenses. Initially we note that the defendant failed to object at trial regarding the prosecutor's comments to the jury during voir dire and to various hearsay statements, which were discussed in the first assignment of error. Thus, the defendant has waived all but plain error as to these assertions. State v. Landrum
(1990) 53 Ohio St.3d 107, 111; see also Crim.R. 52(B).
{¶ 36} During the testimony of Patrolman Kenner, a Bellefontaine police officer who interrogated the defendant, the prosecutor asked the following question: "During that interrogation, did Mr. Brown profess his innocence?" Trial counsel for the defendant immediately objected to this question, and the court conducted a bench conference out of the presence and hearing of the jury, which consisted of the following dialog between the court and the two prosecutors:
 {¶ 37} "Court: First of all, what do you expect the answer to be?
 {¶ 38} "Mr. Heaton: That he professed his innocence.
{¶ 39} "Court: Okay. Isn't this Geboy revisited?
 {¶ 40} "Ms. Kellogg-Martin: Geboy was about post — after he is — this is a situation where he waived his miranda [sic] rights. He never asked for a lawyer and he knowingly engaged —
 {¶ 41} "Mr. Heaton: That's fine. If you don't want me to ask a question about it, it doesn't matter to me.
 {¶ 42} "Court: I'm going to sustain the objection."
{¶ 43} The prosecutor asked no further questions of this witness after the objection was sustained. Although we find the asking of this question to be improper, counsel for the defendant, being fully advised of the expected answer, which was beneficial to his client, did not withdraw his objection, and the jury never received the answer as the objection was sustained. Therefore, given the circumstances surrounding this question, including the apparent strategy of defense counsel in choosing not to have the expected answer related to the jury, we cannot find that the asking of the question, alone, affected the fairness of the trial or should constitute reversible error.
{¶ 44} The hearsay statements elicited by the prosecutor, which were sustained upon objection, did not affect the fairness of the trial because the trial court remedied any prejudice by not allowing the witness to answer or by striking the answer and instructing the jury to disregard. As previously discussed, the remaining questions that were given without objection do not rise to the level of plain error. Thus, while we do not believe that the State should engage in asking a line of questions to a witness who lacks first-hand knowledge of the answer, knowing that the witness' responses are hearsay, we do not find that the fairness of the trial was affected to a level constituting plain error.
{¶ 45} The defendant further asserts that the prosecutor's comments to the jury during voir dire regarding the grand jury's finding was prosecutorial misconduct. During voir dire, the prosecutor made the following comments: "The grand jury is made up of nine citizens, and they have to determine whether or not a crime probably was committed and whether or not the individual charged with a crime probably did it, as opposed to be [sic] beyond a reasonable doubt, which I'll talk about in a second and the Court will instruct you on. In this particular case, the grand jury found that David Brown probably committed aggravated robbery, aggravated murder and gross abuse of a corpse against an individual by the name of James Tanner. Those of you that are chosen as jurors are going to have to make that determination beyond a reasonable doubt * * *. Does everybody understand what the grand jury does and they're talking about probable cause and your determination has to be based beyond a reasonable doubt as the judge will define that for you? Do you understand that there's a difference, and that as Mr. Brown sits here, he's cloaked in innocence until he is proven guilty by the evidence from the stand? * * * Does everybody believe that they can sit and make the determination based upon the evidence from this witness stand as opposed to something that the grand jury did?"
{¶ 46} We agree with the defendant that commenting on and characterizing the findings of the grand jury in this manner was improper. However, given the entire context of these remarks and the subsequent statements made by the prosecutor, we do not find that these statements warrant a finding of plain error.
{¶ 47} Although the defendant maintains that the forensic evidence directly implicating the defendant was insignificant, the testimony before the jury, exclusive of the improper remarks and questions propounded by the prosecutor, was sufficient to find him guilty of aggravated murder and aggravated robbery. Therefore, we do not find that the substantial rights of the accused were prejudicially affected. Thus, the fourth assignment of error is overruled.
 Fifth Assignment of Error {¶ 48} "APPELLANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AMENDMENT TO FEDERAL CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION. (In passim)"
{¶ 49} This Court has previously addressed the issue of ineffective assistance of counsel when a trial has taken place and has determined that courts must consider "`whether the accused, under all the circumstances * * * had a fair trial and substantial justice was done.'"State v. Jones (Sept. 27, 2000), Auglaize App. No. 02-2000-07, 2000 WL 1420271, *2 (quoting State v. Calhoun (1999), 86 Ohio St.3d 279, 289). In addition, attorneys licensed by the State of Ohio "are presumed to provide competent representation." Jones, supra (citing State v. Hoffman
(1988), 129 Ohio App.3d 403, 407).
{¶ 50} The State of Ohio has also adopted the two-part test for determining whether a criminal defendant has been denied the effective assistance of counsel established by the United States Supreme Court inStrickland v. Washington (1984), 466 U.S. 668. See State v. Bradley
(1989), 42 Ohio St.3d 136, paragraph two of the syllabus. "A convicted defendant must first show that his attorney's performance `fell below an objective standard of reasonableness,' and must then show that `there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones, supra
(quoting Strickland v. Washington, 466 U.S. at 688, 694). As to the first prong of the test, courts are to afford a high level of deference to the performance of trial counsel. Bradley, 42 Ohio St.3d at 142. Regarding the second prong of Strickland, reasonable probability requires a probability sufficient to undermine the confidence in the outcome of the trial. Id. It is with these standards in mind, that this Court now scrutinizes the proceedings below.
{¶ 51} The defendant maintains that trial counsel's failure to object to the hearsay testimony of Detective Kennedy and his failure to adequately challenge the expertise of Ronald Huston, who testified that the footprint on the plastic was that of the defendant, constituted ineffective assistance of counsel. As discussed in the first assignment of error, much of the hearsay testimony given by Detective Kennedy involved the movements of the victim, James Tanner, prior to his death, which were collateral matters. As such, counsel's failure to object to these statements was not so egregious so as to fall below an objective standard of reasonableness nor does the defendant demonstrate that the result of the proceeding would have been different but for this alleged error. In addition, although trial counsel could have objected to other hearsay statements involving what happened when Tanner was killed, we must afford a high level of deference to the performance of trial counsel. In considering the trial in its entirety, we do not find that trial counsel's performance was unreasonable nor do we find that the result would have been different but for trial counsel's failure to object to the other hearsay statements.
{¶ 52} Our inquiry does not end there, however. The defendant contends that the footprint evidence was the most damaging form of evidence to his case, aside from Tibor Jonas' testimony, as it directly implicated him in the murder of Tanner. Thus, the defendant maintains that trial counsel should have challenged Huston's expertise in the field of footprint analysis because of the uniqueness of the discipline.
{¶ 53} Our review of the record reveals that the trial court afforded the defendant the assistance of latent print examiner Ralph Nickoson, but he did not present Nickoson as a witness. Rather than challenge Huston's expertise as a witness, trial counsel elected a strategy that emphasized the timing of the print. When cross-examining Huston, trial counsel asked questions related to when the footprint was placed on the plastic. Counsel was able to question Huston in a manner that led Huston to concede that the print could have been on the plastic for quite some time and that he could not determine the amount of time that the print had been on the plastic. During closing arguments, trial counsel elected to emphasize this point to the jury and to stress that the print could have been placed on the plastic when the defendant covered his windows to prevent a draft. Given the discretion that is afforded to trial counsel in determining trial strategy, we find that counsel's performance was not unreasonable, especially in light of the fact that he had access to the input, expertise, and opinion of Ralph Nickoson, an independent latent print examiner. Therefore, the fifth assignment of error is overruled.
{¶ 54} For all of these reasons, the judgment of the Common Pleas Court of Logan County, Ohio, is affirmed.
Judgment affirmed.
BRYANT and HADLEY, JJ., concur.
[1] During cross-examination, Jonas did concede that he could not remember if they switched the cars prior to or after Tanner was killed.